THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. EDWARD RODRIGUEZ, Defendant-Appellant.

First District (3rd Division)   No. 1—92—1136

Opinion filed October 12, 1994.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Sang Won Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a jury trial, defendant, Edward Rodriguez, was convicted of aggravated criminal sexual assault (Ill. Rev. Stat. 1991, ch. 38, par. 12—14(a)(1) (now 720 ILCS 5/12—14(a)(1) (West 1992))), home invasion (Ill. Rev. Stat. 1991, ch. 38, par. 12—11(a)(1) (now 720 ILCS 5/12—11(a)(1) (West 1992))), and intimidation (Ill. Rev. Stat. 1991, ch. 38, par. 12—6 (now 720 ILCS 5/12—6 (West 1992))). He was sentenced to 35 years' imprisonment for the aggravated criminal sexual assault and 35 years' imprisonment for the home invasion to run consecutively. He was also sentenced to five years' imprisonment for intimidation to be served concurrently.

On appeal, defendant asserts that (1) the admission of hearsay statements showing that he had a propensity to commit sex crimes was reversible error; (2) the admission of other crimes evidence violated the rules of discovery; (3) the admission of hearsay statements by the State's investigator was prejudicial; (4) the trial court erred in barring testimony about the victim's description of the

gun to police; and (5) defendant's conviction for home invasion should be vacated because it was a lesser included offense of, and was based on the same physical acts as, the aggravated criminal sexual assault. We affirm in part and vacate in part.

The victim, B.L., testified that she was 13 years old on February 20, 1991, when she spent the night at the home of her best friend, Salina Rodriguez, who is defendant's daughter. That night, defendant touched B.L.'s breasts and buttocks. He was later arrested and given a March 1991 court date.

On February 28, 1991, B.L. went to sleep at 9 p.m. She was alone in her bedroom. During the night, she heard her bedroom door open and close. B.L. stated that she saw defendant, who was standing in front of her bed, staring at her. B.L. turned her head toward the wall and put the covers over her head, but defendant sat on the bed and pulled back the covers. As he touched B.L.'s back and breast, she cried and told him to leave her alone, but he told her to shut up. He touched her stomach and breasts, then rubbed her thighs and vagina. B.L. slapped his hand away, but defendant took out a black gun with a brown handle and pointed it at her face. He then took off her underwear and put his finger inside her vagina.

At that point, defendant got up and unbuttoned his shirt and pants. He then proceeded to insert his penis inside B.L. When his penis was halfway into her vagina, he took it out and masturbated, then put B.L.'s hand on his penis. When she pulled it away, defendant took out his gun and rubbed it across her stomach to her leg. He then took her hand and made her rub his penis. Again, defendant put his penis inside B.L., then took it out, kissed her breast and vagina, and stuck his tongue into her vagina.

Defendant told B.L. that he would kill her or get someone to kill her if she went to court or said anything against him. Defendant pointed out how easy it was for him to get into her apartment. Defendant also said that he would hurt her and kill her family when he got out of prison.

According to B.L., she heard her mother, who gets up around 5:30 or 6 a.m., walking around. Defendant told B.L. to shut up, then pulled the blanket over his head and got between B.L. and the wall. When B.L.'s mother came in and told her "to get up and get the curling iron," defendant rubbed his penis against B.L.'s buttocks and pointed the gun in her back. B.L. told defendant that her mother would come in again if she did not get up, so B.L. got up, put on a T-shirt and underwear, and went into the bathroom, where she signalled to her mother. B.L., who was crying and shaking, told her mother that defendant was in the bedroom, had a gun, and had raped her.

Because there was no telephone in the apartment, B.L.'s mother went outside to call the police. As she went out the side door, B.L. saw defendant leaving through the back door. She called to her mother, telling her that defendant was leaving and had a gun. When her mother returned, they waited for the police. When the police did not arrive, B.L. and her mother went to the police station. They took the police officers to defendant's home, then B.L. was taken to Mercy Hospital.

On cross-examination, B.L. denied that Tim Baugh, a friend, was with her on February 27 or 28, 1991. B.L. stated that she did not scream during the attack because she was afraid that defendant would hurt her or her family. B.L. said that there were Newport cigarettes left in her room after the attack, but that both defendant and Baugh smoked Newports.

In addition, B.L. explained that the reason she and Salina went to the police station on February 20, 1991, was that Salina came to her home and said that defendant had molested her. She denied that she and Salina planned to have defendant arrested so that Salina could go out more often.

Alice L., B.L.'s mother, testified that on February 23, 1991, she was awakened from her sleep when she felt someone in her home. She saw a man staring at her from the doorway. Alice L. asked the man what he was doing in her home, but he just stared. Then, he went into the kitchen, took something off the table, and went out the back door. After he left, Alice L. noticed that the back door had been pried open.

Alice L. reported the incident to the police. She described the man as being in his late 30's, 5 feet 4 inches tall, and weighing 130 to 140 pounds. He had dark hair and a moustache and was wearing a grey coat and dark pants. Alice L. had never seen the person before, although she now knew that it was defendant. On February 28, 1991, Alice L. got up at 5:30 a.m. When she could not find her curling iron, she went into B.L.'s bedroom to ask her to get it. B.L. was completely covered, seemed nervous, and would not get out of bed. After Alice L. returned to the kitchen to pour a cup of coffee, B.L. came out of the bedroom and went into the bathroom. When she motioned to Alice L., she was shaking and crying. She told Alice L. that defendant was in her bedroom and had a gun.

As Alice L. took B.L. into her own bedroom, she passed B.L.'s bedroom and saw the blanket moving. Alice L. woke up her son and told him to stay with B.L. Alice L. got dressed and went to call the police. After she went out the side door, B.L. shouted that defendant was going out the back door. Alice L. went around the building and

saw defendant walking down the stairs. Alice L. yelled to defendant that she knew who he was. According to Alice L., the man she saw leaving her home on February 28, 1991, was the same man who was in her apartment on February 23, 1991.

After calling the police, Alice L. returned home. After waiting for 10 minutes, she and B.L. went to the police station. The police officers took them to defendant's home, where they identified him. Then, B.L. was taken to the hospital.

Chicago police officer Daniel Lukensmeyer testified that on February 28, 1991, at 7 a.m., he spoke with B.L., who was whimpering and holding on to her mother. After B.L. told him that she had been sexually assaulted by defendant, Officer Lukensmeyer went to defendant's home with B.L. and her mother.

Victoria Gonzalez, defendant's common law wife, answered the door and directed the police officers to the living room where defendant was sitting on the couch. After defendant was placed under arrest and advised of his *Miranda* rights, his apartment was searched for a gun, but none was found. When Lukensmeyer walked out of the building with defendant, B.L. and her mother both said, "that's Eddie."

There was a stipulation that Officer R. Mitchell responded to a call of trespass to a residence at the Alice L. home on February 23, 1991, at 9:30 a.m. The description was of an Hispanic man in his 30's, who was 5 feet 4 inches tall, weighed 120 pounds, had black hair and a moustache, and was wearing a grey coat and black pants.

Cathryn Gianakeas, a registered nurse at Mercy Hospital and Medical Center, testified that she spoke with B.L. when she came into the emergency room on February 28, 1991. B.L. told Gianakeas that her best friend's father had broken into her home around 5 a.m., threatened her with a gun, and raped her.

Carol Dwyer, a registered nurse at the Mercy Hospital and Medical Center, testified that she spoke to B.L. on February 28, 1991. After B.L. stated that she had been sexually molested, she was taken into a private room where she was thoroughly examined.

Pam Fish, a criminalist in the serology unit of the Chicago police department crime laboratory, testified that she examined B.L.'s vitullo kit. There were spermatozoa and semen present on the vaginal swab, but the oral and rectal swabs were negative.

After the State rested its case in chief, Salina Gonzalez testified that she and B.L. skipped school on February 20, 1991, and spent all day at B.L.'s house. B.L. suggested that they put defendant in jail so that Salina would not have so many chores at home and could go out more often.

According to Salina, she and B.L. went to the police station about an incident with her father that allegedly occurred on February 18, 1991. Salina testified that her statements to the police regarding that incident were not true. The first time she told anyone the truth was when she told her mother a week later.

On cross-examination, Salina stated that her mother was as strict as her father and would continue to impose rules even if her father were in jail. Salina testified that she ran away from home in September 1991 and went to the home of Nancy Vasquez, who is Salina's sister's aunt and a close friend to Salina. Salina denied telling Vasquez that her mother hit her or that her mother threatened to get the Latin Kings to rape her if she did not change her story about her father and say that nothing ever happened.

Virginia Hernandez, who is 23 years old and defendant's niece, testified that she was living with defendant and Victoria Gonzalez on February 28, 1991. That night, Hernandez went to sleep around 1 a.m. She woke up around 2:30 a.m. when Victoria came home from work, then went back to sleep. She was awakened at 7:30 a.m. by a knocking at the door. According to Hernandez, the police came in and grabbed defendant, who was sleeping. Five or six police officers then searched the front room and bedroom.

Victoria Gonzalez, 32, testified that on February 20, 1991, she went to the police station. A week later, Salina admitted that defendant did not molest her. On February 28, 1991, Gonzalez worked as a supervisor for a cleaning company from 5:30 p.m. to 1:30 a.m. When she returned home from work around 2:30 a.m., defendant opened the door for her. Hernandez was lying on the couch. After Gonzalez and defendant ate, they watched television in the front room until she fell asleep. Around 5 a.m., their daughter, Rosa, came into the room to turn off the television, but defendant told her to go back to sleep.

According to Gonzalez, the next time she awoke was 6 a.m. when her baby was crying. After taking care of the baby, she lay down in bed with the baby. Around 7 a.m., she was awakened when five or six police officers entered the apartment and arrested defendant. On cross-examination, Gonzalez denied saying, "Eddie, you did it again, Eddie, you broke your promise" and "What, I'm not good enough for you?"

Timothy Baugh, 21, testified that he worked for Hoverson & Sons at 21 South Water Market unloading semi-trailers. He claimed that he had been working there for $1^1/_2$ years in February 1991 and was still working there part-time. Baugh stated that he worked from 2:30 to 11 p.m. on February 27, 1991. After work, between 1 and 2 a.m.,

he went to B.L.'s home. He went into her bedroom and talked with her for about a half hour before falling asleep. After spending the night, Baugh woke up about 5:15 a.m., lit a Newport cigarette, and went to the washroom. He then woke up B.L. and told her he was leaving. He left around 6 a.m. Baugh denied having sex with B.L.

When defense counsel asked to call the arresting police officers regarding parts of their report that contradicted evidence presented by the State, the trial court denied the request. The defense counsel argued that B.L. had testified that the gun was black with a brown handle whereas the arrest report describes the gun as a bluesteel revolver. The trial court denied the request on the grounds that a bluesteel revolver is black in color. The trial court stated that the discrepancy was the difference between a layperson describing the gun and a police officer using a term of art.

In rebuttal, the State called Timothy Hoverson, the owner of the commission house for South Water Market. Hoverson testified that Baugh did not work for him either on February 26, 27, or 28, 1991, or at the time of the trial. Baugh had only worked for him on occasion, doing odd jobs.

Nancy Vasquez testified that Salina came to her home in September 1991 after running away from home. At that time, Salina told Vasquez that defendant had molested her and her friend, B.L. Salina did not want to go home because she had been beaten by her mother, who threatened that if Salina did not change her testimony, she would have Salina beaten up and raped by the Latin Kings. After staying with Vasquez for two or three days, Salina returned home. When Salina's mother came to get her, Salina started crying and said she was lying about having been raped by her father and having been threatened by her mother.

Chicago police officer Carol Kacor testified that she interviewed B.L. and Salina on February 20, 1991, about the alleged molestation by defendant. A month later, Kacor was at a restaurant when she saw Salina with her grandmother. Salina came over and said, "Thank you for everything you did for me with the incident regarding my father."

Officer Lukensmeyer testified that the only adults he saw in defendant's apartment on February 28, 1991, were defendant and Gonzalez. When Lukensmeyer told Gonzalez that he was arresting defendant for the rape of a 13-year-old girl, she turned to defendant and said, "You did it again. You broke your promise. You did it again. You promised me. You broke your promise." Gonzalez then asked, "What? Am I not good enough for you?" Lukensmeyer did not write any reports or notes and was testifying from memory.

After deliberations, the jury found defendant guilty of aggravated criminal sexual assault, home invasion, and intimidation. The trial court sentenced defendant to consecutive terms of 35 years' imprisonment for the aggravated criminal sexual assault and home invasion and to a concurrent term of five years' imprisonment for intimidation.

On appeal, defendant asserts that reversible error occurred when the State elicited the hearsay statements by Gonzalez to defendant, "You did it again. You broke your promise. You did it again. You promised me. You broke your promise," and "What? Am I not good enough for you?" Defendant argues that the statements were not proper impeachment of Gonzalez because they were evidence of other crimes used to show that he had a propensity to commit sex crimes. Not only were those statements improperly admitted during Gonzalez's cross-examination and Officer Lukensmeyer's rebuttal testimony, defendant contends, but the error was exacerbated by the State's closing argument remarks about the statements.

■ We agree. It is obvious that Gonzalez's out-of-court statements were admitted as evidence of defendant's propensity to commit sex crimes. Not only were they double hearsay, but they were an alleged out-of-court accusation by a defense witness that defendant had "done it again." Even though some inconsistent out-of-court statements may be admissible to impeach a witness (*People v. Davis* (1984), 130 Ill. App. 3d 41, 53, 473 N.E.2d 387), evidence of other crimes is not admissible to attack the credibility of a witness. *People v. Romero* (1977), 66 Ill. 2d 325, 329-32, 362 N.E.2d 288.

Evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182, 449 N.E.2d 821; *People v. Lopez* (1992), 228 Ill. App. 3d 1061, 1078, 593 N.E.2d 647.) The law distrusts the inference that because a man has committed other crimes, he is more likely to have committed the offense charged. *People v. Jones* (1993), 156 Ill. 2d 225, 239, 620 N.E.2d 325.

Although we have concluded that the State's cross-examination of Gonzalez was improper, we find the error to be harmless. The evidence in support of the conviction was so clear and convincing that the jury's verdict would not have been different without those statements. *People v. Austin* (1989), 133 Ill. 2d 118, 124, 549 N.E.2d 331.

Next, defendant asserts that the introduction of Gonzalez's out-of-court statements violated the rules of discovery because they were an alleged oral admission by defendant to Gonzalez. Although the alleged statements were made in Lukensmeyer's presence, they were

not tendered by the State in discovery. Defendant maintains that the State would have knowledge of any statements made to Officer Lukensmeyer, whom the State called in its case in chief. Furthermore, defendant argues that the admission of those statements was prejudicial because they were admissions of other sex crimes he committed and the State used the tactic of surprise to gain a tactical advantage.

The State argues that the rules of discovery do not require disclosure of Gonzalez's statements because they came from a defense witness, not a State witness, and were not recorded or memorialized.

■ We reject the State's argument. When Gonzalez said to defendant, "You did it again. You broke your promise. You did it again. You promised me. You broke your promise," and "What? Am I not good enough for you," those words were actually alleged confessions made by defendant to Gonzalez regarding other sex crimes he had committed.

The goals of pretrial discovery in a criminal trial are to promote the search for truth, to afford an accused protection against surprise, unfairness, and inadequate preparation, and to eliminate surprise as a trial tactic. (*People v. Boclair* (1987), 119 Ill. 2d 368, 373, 519 N.E.2d 437; *People v. Bailey* (1982), 103 Ill. App. 3d 503, 431 N.E.2d 723.) The rule requires disclosure by the State of the substance of any oral statements by the accused. (*People v. Orr* (1986), 149 Ill. App. 3d 348, 359, 500 N.E.2d 665; *People v. DeBord* (1978), 61 Ill. App. 3d 239, 377 N.E.2d 1308.) The State's obligation includes any alleged statements made by the defendant to anyone that might have bearing on his guilt or innocence. (*People v. Steidl* (1991), 142 Ill. 2d 204, 228, 568 N.E.2d 837.) Listing a witness on the witness list is not enough. A statement to a witness who was listed on the State's witness list must also be disclosed to the defendant. (*People v. Furlong* (1991), 217 Ill. App. 3d 1047, 1053, 578 N.E.2d 77.) The requirement of discovery of the defendant's statements also applies to evidence in rebuttal. 134 Ill. 2d R. 412(a).

The State had, or should have had, notice of the statements. Lukensmeyer was a State witness. During preparation of Lukensmeyer's testimony, the State would have learned of the statements. It is clear that the State knew of the statements during its cross-examination of Gonzalez, if not sooner. Thus, we find that the State's nondisclosure of Gonzalez's statement was improper.

In order to warrant reversal of a conviction, the nondisclosure must have prejudiced the defendant's presentation of his defense. (*Furlong*, 217 Ill. App. 3d at 1053.) The closer the evidence, the stronger is the case for excluding the statement or declaring a mistrial. The strength of the undisclosed evidence, the likelihood that

prior notice could have helped the defense discredit the evidence, and the willfulness of the State in failing to disclose are also factors to be considered. (*People v. Weaver* (1982), 92 Ill. 2d 545, 560, 442 N.E.2d 255; *People v. Hood* (1992), 229 Ill. App. 3d 202, 216, 593 N.E.2d 805.) Considering the strong eyewitness evidence against defendant, we conclude that the State's nondisclosure did not prejudice defendant.

As to the argument that the State improperly referred to the statements during closing argument, the State contends that defendant waived the issue because he did not object to the remarks during closing argument.

■ The State is mistaken. Defendant did not waive the issue of the State's closing argument because his objection to the testimony had already been overruled during trial. Since the defense had already unsuccessfully objected to the testimony, to require still another objection during closing argument would be duplicative and unfair. (*People v. Epps* (1986), 143 Ill. App. 3d 636, 639, 493 N.E.2d 378.) We find, however, that the State's closing argument remarks about Gonzalez's statements were not prejudicial to defendant.

Defendant next asserts that he was denied a fair trial by the admission of hearsay statements by the State's investigator that Salina's mother had threatened to have members of the Latin Kings gang rape or beat Salina. In response, the State contends that the testimony was proper state of mind evidence admitted to rebut Salina's testimony that she did not change her story because her mother threatened to have the Latin Kings beat and rape her.

■ At trial, Salina had testified that her allegations against defendant were a fabrication. In rebuttal, the State called its investigator, who testified that he tried to interview Salina, but that she refused to speak with him. She told him that defendant was still her father and that she did not want to talk to him. The investigator then testified that Salina's mother had threatened to have Salina raped or beaten by several Latin Kings gang members.

We find that the investigator's rebuttal testimony was improper hearsay. There was no evidence that Salina was afraid to talk to the investigator, only that she did not want to speak with him. Through improper testimony, the State bolstered Nancy Vasquez's testimony that Salina's mother had threatened Salina. Nancy Vasquez's testimony was properly received in evidence. However, due to the overwhelming evidence against defendant, we find the error to be harmless.

Next, defendant asserts that the trial court erred in barring testimony about B.L.'s description of the gun to police. Defendant wanted to impeach B.L. with her statement that the gun was black

with a brown handle because the police report stated that the gun was a bluesteel revolver.

■ This argument has no merit because the proposed evidence about the gun was collateral and nonimpeaching. Thus, the trial court did not abuse its discretion in excluding the evidence.

■ Next, defendant asserts that cumulative errors prejudiced him. (*People v. Davidson* (1992), 235 Ill. App. 3d 605, 613, 601 N.E.2d 1146.) We disagree. Any error that occurred did not prejudice defendant because the eyewitness testimony against defendant was extremely strong.

Finally, defendant asserts that his conviction for home invasion should be vacated because it was a lesser included offense of aggravated criminal sexual assault. If not a lesser included offense, defendant argues that both convictions were based on defendant being armed with a deadly weapon, thus making the home invasion and the aggravated criminal sexual assault based on the same physical act. We agree.

The jury was instructed that defendant could be found guilty of aggravated criminal sexual assault if he committed an act of sexual penetration on B.L. and either (1) displayed or threatened to use a dangerous weapon; or (2) the act of sexual penetration was committed during a home invasion. It was also instructed that defendant could be found guilty of home invasion if (1) he entered the home knowing that someone was present; (2) he was armed with a dangerous weapon; and (3) while armed with the dangerous weapon, threatened the imminent use of force on B.L., who was inside the home.

First, we consider whether the home invasion was a lesser included offense of the aggravated criminal sexual assault. Multiple convictions based on a single act cannot stand where a defendant is convicted of more than one offense if some are lesser included offenses. (*People v. Williams* (1986), 143 Ill. App. 3d 658, 665, 493 N.E.2d 362.) In order to be classified as a lesser included offense, all the elements must be included within the greater offense or there must be a less culpable mental state. *People v. Smith* (1980), 78 Ill. 2d 298, 306, 399 N.E.2d 1289; *People v. Brown* (1991), 218 Ill. App. 3d 890, 898, 578 N.E.2d 1168.

The trial court did not specify which aggravating factor resulted in the conviction for aggravated criminal sexual assault. If the conviction was based on the aggravating factor of the home invasion, home invasion would be a lesser included offense of aggravated criminal sexual assault because every element of home invasion would be included in the aggravated criminal sexual assault with the aggravating factor being home invasion. Since defendant was

convicted of both offenses, we can assume that home invasion was the underlying offense.

If the conviction was based on the defendant displaying or threatening to use a dangerous weapon and not on home invasion, the home invasion would not be a lesser included offense. The issue would then be whether the home invasion and the aggravated criminal sexual assault were based on separate acts. Factors to determine whether the defendant's conduct consisted of a single act or multiple acts include: (1) the existence of an intervening act or event; (2) the time interval between successive parts of the defendant's conduct; (3) the identity of the victim; (4) the similarity of the acts performed; (5) whether the conduct occurred at the same location; and (6) the prosecutorial intent as reflected in the language of the information. *Williams*, 143 Ill. App. 3d at 665.

■ After considering these factors, we conclude that the home invasion and aggravated criminal sexual assault were part of the same physical act. (See *People v. Zarate* (1994), 264 Ill. App. 3d 667; and *People v. Govednik* (1986), 150 Ill. App. 3d 717, 502 N.E.2d 276.) Home invasion is not completed until the offender, armed with a dangerous weapon, either uses or threatens force against someone inside the house or injures him. (*People v. Govednik* (1986), 150 Ill. App. 3d 717, 723, 502 N.E.2d 276.) Thus, both the home invasion and aggravated criminal sexual assault occurred when defendant threatened the victim with the gun. The two offenses were so interrelated that we are vacating the home invasion conviction because it was based on the same act as the aggravated criminal sexual assault. In accordance, we also vacate the sentence for home invasion.

Based on the foregoing, we affirm the conviction and sentence for aggravated criminal sexual assault, vacate the conviction for home invasion, and vacate the sentence for home invasion.

Affirmed in part; vacated in part.

RIZZI and GREIMAN, JJ., concur.