# Illinois Official Reports

## Appellate Court

---

### *People v. Lewis*, 2019 IL App (1st) 160864

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JUAN LEWIS, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-16-0864 |
| Filed | March 29, 2019 |
| Rehearing denied | April 26, 2019 |
| Modified<br>opinion filed | May 6, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-9642; the Hon. Timothy Joseph Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Erin Sostock, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, John E. Nowak, and Daniel Piwowarczyk, Assistant State's Attorneys, of counsel), for the People. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court, with opinion.
Justices Pierce and Griffin concurred in the judgment and opinion.


**OPINION**

¶ 1     Defendant Juan Lewis was convicted of aggravated discharge of a firearm and sentenced to 16 years in prison. On appeal, Mr. Lewis argues that his right to confront witnesses was violated when the State presented the conclusions of one firearms identification expert through the testimony of another expert, who did not do the testing that led to those conclusions. Mr. Lewis did not object to the testimony at trial but asks us to reverse for plain error. We agree with Mr. Lewis that this testimony was improper but agree with the State that an objection to this testimony was required, and therefore, we affirm.


¶ 2                              I. BACKGROUND

¶ 3     At trial, the State presented two occurrence witnesses—Chicago police officers Israel Gamez and John Gregoire—and several forensic witnesses. Although the confrontation issue turns solely on the firearms identification testimony, Mr. Lewis's claim requires us to consider the strength of the other evidence as well. We will therefore summarize all of the testimony presented at trial.


¶ 4                    A. Testimony of the Arresting Officers

¶ 5     Officers Gamez and Gregoire were on routine patrol on April 30, 2008, at approximately 12:30 a.m. in the area of 12334 South Lowe Avenue when they saw a man, whom they identified at trial as Mr. Lewis, walking eastbound on 124th Street. Officer Gregoire, who was driving, made a U-turn and pulled up beside Mr. Lewis. Officer Gamez testified that he called out to Mr. Lewis from the passenger seat of the car, but Mr. Lewis continued walking. Officer Gamez opened the passenger-side door of the car, Mr. Lewis looked in the officers' direction, turned around to run, and pulled a handgun out of his jacket pocket.

¶ 6     Officer Gregoire similarly recalled Officer Gamez asking Mr. Lewis for identification, through the open window, at which point Mr. Lewis pulled a "blue steel handgun" from his hoodie and began to run. Officer Gregoire followed Mr. Lewis in the patrol car, driving onto the sidewalk and between buildings, until a set of pylons blocked his way. Officer Gamez jumped out of the car and pursued Mr. Lewis on foot, keeping Mr. Lewis in his line of sight. Officer Gregoire exited the car and ran in the other direction, hoping to intercept Mr. Lewis.

¶ 7     Officer Gamez testified that he followed 15 to 20 feet behind Mr. Lewis as Mr. Lewis ran around a building, into a parking lot, and eventually across the street and in between two houses. At this point, Officer Gamez could still see Mr. Lewis and continued to announce his office and tell Mr. Lewis to drop his gun. Officer Gamez testified that he was 10 to 15 feet behind Mr. Lewis when Mr. Lewis ran between 12334 and 12338 South Lowe Avenue and into the gangway of 12334 South Lowe Avenue.

¶ 8     The two officers' accounts varied slightly as to what occurred next. Officer Gamez testified that Mr. Lewis "was mid-way into the gangway [when] he turned his body halfway

around and pointed a gun" and shot at Officer Gamez. Officer Gamez reported that he was being shot at over his radio. After firing the first shot, Mr. Lewis kept running to the end of the gangway and into the backyard of the building, where he turned around, pointed the gun over his right shoulder, and shot at Officer Gamez again and then "immediately went behind the frame of the house." Officer Gamez lost sight of Mr. Lewis for "less [than] a second," slowed down, then slowly moved around the frame of the house. He then saw Mr. Lewis running toward the backyard's exit, still with the gun in his hand. Mr. Lewis turned and pointed the gun at Officer Gamez once more, and in response Officer Gamez fired six or seven times at Mr. Lewis. Officer Gamez believed he had hit Mr. Lewis because Mr. Lewis "went down and he hit this pole exiting the backyard and then he rolled into the alley." Officer Gamez said he saw Mr. Lewis's body "spin." He did not see Mr. Lewis throw the gun away. Both officers approached Mr. Lewis with their guns drawn and ordered him to show his hands. Mr. Lewis eventually complied, rolling over to show the officers his hands, and Mr. Lewis was arrested.

¶ 9    Officer Gregoire's account was that, once he exited the car, he ran around to the front of a building and saw Officer Gamez and Mr. Lewis already running past him. He heard Officer Gamez say, "police, drop the gun," and then saw the two run across Lowe Avenue and into a gangway between two houses. Officer Gregoire then crossed the street and saw Mr. Lewis, while in the gangway, turn and fire a shot. Officer Gregoire testified that Officer Gamez fired a shot in return. Mr. Lewis disappeared out of Officer Gregoire's sight briefly, reappeared, and then went behind the house. At that point, Officer Gamez slowed down. Officer Gregoire testified that as he approached the gangway, he radioed to report that shots had been fired both at them and by them. Officer Gregoire stated that "Mr. Lewis popped back out," he (Officer Gregoire) heard another shot, Officer Gamez fired another shot in return, and then Mr. Lewis "hit, like a post and landed in an alley." Officer Gregoire thought Mr. Lewis had been shot, but when the officers approached him they learned this was not the case. The officers rolled Mr. Lewis over but his gun was not on him. They eventually found it approximately 20 feet away. Officer Gregoire also testified that he did not see Mr. Lewis throw a weapon but also testified that everything happened very quickly and Officer Gamez was closer to Mr. Lewis in the backyard than he was.

¶ 10                                B. The Physical Evidence

¶ 11    Officers David Ryan and Brian Smith, forensic investigators for the Chicago Police Department, testified that on April 30, 2008, they performed a gunshot residue (GSR) test on Mr. Lewis's hands and jacket at approximately 2:15 a.m., at the police station. At the scene of the shooting, at approximately 2:40 a.m., the officers recovered from Officer Gamez his service weapon, a Beretta model 8000 "D," with eight live rounds in the magazine and one live round in the chamber.

¶ 12    Officer Ryan testified that he and Officer Smith also recovered a gun near a pole in the alley at approximately 12338 South Lowe Avenue—a black Glock model 19 that he said was "upside down leaning up against the fence" with its barrel in the dirt. Officer Ryan did not know how long that gun had been there. He testified that "the slide [was] partially back and there was a malfunction to the weapon"; it had experienced a "double feed" or a jam that "render[ed] th[e] weapon incapable of being fired." Because the Glock also had a capacity of 16 live rounds and they recovered only 14 live rounds from the gun, Officer Ryan concluded that two shots had been fired from that weapon.

¶ 13    Officer Ryan testified that a fired Win (Winchester) 9-millimeter Luger *plus "P"* cartridge case was found "not far from th[e] gun on the alley pavement." Six additional Win (Winchester) 9-millimeter Luger plus "P" cartridge cases were found in the backyard area of 12334 South Lowe Avenue. Officer Ryan testified that because this type of ammunition is used by police officers, Officer Ryan believed that these seven cartridges had been fired from Officer Gamez's Beretta.

¶ 14    After raking underneath some bushes the officers found one additional fired cartridge case in the gangway—a S&B (Sellier & Bellot) 9-millimeter Luger. Officer Ryan could not say how long that cartridge case had been under the bushes.

¶ 15    Robert Berk, a trace evidence analyst for the Illinois State Police, examined the GSR tests from Mr. Lewis's hands and the jacket that he was wearing when he was arrested. Mr. Berk explained that GSR particles have three elements—lead, barium, and antimony—that are only found together when a firearm is discharged. A "consistent particle," in contrast, "has one or two of the elements present" and can result not only when a firearm is discharged but also from "an environmental or occupational source." The samples collected from Mr. Lewis's hands were negative for the presence of GSR but were positive for the presence of "consistent particles." The cuffs of the brown jacket, however, were positive for GSR, which indicated that the cuffs had either "contacted an item that had primer [GSR] on it, or that they were in the environment of a discharged firearm." According to Mr. Berk, these results were consistent with someone firing a gun while wearing the jacket. Mr. Berk acknowledged on cross-examination that it was possible that Officer Gamez, who fired multiple shots, could have transferred the residue to Mr. Lewis during the arrest.

¶ 16                          C. The Firearms Identification Testimony

¶ 17    Kurt Zielinski, a forensic scientist with the Illinois State Police and an expert in firearms identification, testified that another state forensic scientist, Leah Kane, completed the firearms identification examination in this case but that, at the time of trial, she had been on "medical leave for a number of years already." Mr. Zielinski explained that the state police laboratory's quality assurance program requires each firearms identification to be verified by a second examiner. Mr. Zielinski also testified that a "quality review coordinator reviews case files randomly as well as completely reanalyzes cases to ensure similar findings of the original report." Mr. Zielinski testified that here, he reviewed Ms. Kane's results, and also did "some of the verification" as well as reviewing the case file. When asked whether he "agree[d] with the conclusions" in Ms. Kane's report, Mr. Zielinski stated: "Yes. I've seen that she has followed all procedures in a proper manner."

¶ 18    Mr. Zielinski first testified that the nine unfired cartridge cases recovered from Officer Gamez's Beretta were Winchester 9-millimeter Lugers. Mr. Zielinski also testified that he agreed with Ms. Kane's conclusion that the seven fired Winchester 9-millimeter cartridge cases all came from the Beretta.

¶ 19    Mr. Zielinski then testified about the Glock and the 14 unfired cartridge cases in that gun. According to Mr. Zielinski's testimony, the Glock model 19 9-millimeter firearm had a total capacity of 16 cartridge cases. Mr. Zielinksi said that "[a]ccording to Leah's" report, an examination was done on the Glock and she "noted that the firearm was inoperable as received." The following exchange took place during the State's direct examination of Mr. Zielinski:

"[MR. ZIELINSKI]: She says that during a dry fire—which is a standard procedure to first do—she noted a muted sound, and that a pull of the slide showed that it slowly came back in the forward position.

She then field stripped the firearm and found debris in the firing pin channel as well as in the slide. It was then cleaned—no parts were missing, no parts were broken—but it was very dirty, and after the cleaning, the firearm operated correctly.

[THE STATE]: Okay. And when you say that she saw that there was debris and that she had to clean it, if a firearm was found with—would that be consistent with a firearm that has a *** stovepipe cartridge case in it?

A. It could be, yes.

\* \* \*

Q. And you said that when she examined it, initially, she saw that the slide was the part of the gun that was—had the debris; is that correct?

A. The slide and the firing pin channel, yes."

¶ 20    Mr. Zielinski testified about what it meant for a cartridge case to be "stovepiped," essentially jammed. Using the recovered firearm, Mr. Zielinski then demonstrated what a stovepipe looks like, after which the State inquired:

"Q. And that stovepipe is consistent with what Leah Kane found when she first examined the gun having the slide with debris and also the firing pin; is that correct?

A. Well, this slide not moving freely, it has since been cleaned by Leah, according to her notes. When this slide doesn't move this freely, if it were to require extra force, then yes, that would be consistent with why a stovepipe might happen.

\* \* \*

Q. Okay. Now, what did—after Leah Kane cleaned the gun and did it then operate correctly?

A. It then operated correctly."

¶ 21    On cross-examination with respect to the Glock, Mr. Zielinski had the following exchange:

"[DEFENSE COUNSEL]: And it's clear that the slide was not operating correctly at the time of that bullet or casing being stovepiped, correct?

[MR. ZIELINSKI]: It was locked open. I can't tell from the picture if, at the time the picture was taken, what the condition was. I can just go by Ms. Kane's notes at the time she started her examination that the slide and the fire pin channel had debris inside and it was not functioning correctly when she examined it.

Q. And had you seen that gun—you, specifically, seen that gun Ms. Kane examined and cleaned—did you see the debris that was cleaned out of that gun?

A. No, I did not see the debris.

Q. So you do not know *** what the debris was?

A. No. No, I do not.

Q. And you don't know where the debris came from?

A. No."

¶ 22    Mr. Zielinski testified that Ms. Kane's "examination concluded" that the fired Sellier & Bellot 9-millimeter Luger cartridge case recovered from the gangway was fired from the

Glock.

¶ 23                          D. The Trial Court's Findings

¶ 24        In finding Mr. Lewis guilty, the trial court found Officers Gamez and Gregoire credible and stated that "their testimony [wa]s confirmed by not only the testimony of the forensic investigator who marshaled the evidence that was presented to the Court" and "by the forensic experts who testified and examined and concluded and explained the importance of that physical evidence," but also "by virtue of the nature of the circumstances in this instance." The court found that Mr. Lewis's gunfire was confirmed by the fired cartridge that was raked from the debris underneath the bush in the gangway, "confirming Officer Gamez's testimony and Officer Gregoire's testimony that the gun was fired by Mr. Lewis there." The court also observed that there was no reason for the officers to "manufacture a claim of a second shot in the backyard that ends up not being able to be confirmed by the existence of the second cartridge. It's not conceivable to me that they would manufacture that claim in that manner, under those circumstances." In addition, the court did not believe the officers had planted the gun recovered 20 feet away from Mr. Lewis, finding that the fact that the gun was jammed was consistent with the officers' testimony and

> "to presuppose or conclude that either Officer Gamez or Officer Gregoire—or any other Chicago Police Officer—can manipulate this drop gun—which I would have concluded it was a drop gun dropped by the police to implicate Mr. Lewis—I would have to conclude that they also manipulated the gun in such a manner that they had this unfired or misfired or stovepiped—it's really not stovepiped because it was never actually fired—cartridge cases that's found inside the slide of the gun from loading this next bullet inside the magazine as set forth in the exhibits that both sides have put forth to the Court."

The court also found it significant that the gun was jammed, explaining that "nobody walks around with a jammed gun" and that the jammed gun was "pretty conclusive proof that it was just sought to be fired, and the fact that it was just sought to be fired is consistent with the testimony of Officer Gamez and Officer Gregoire."

¶ 25        The court found Mr. Lewis guilty of two counts of aggravated discharge of a firearm—one with respect to each officer. The court also found Mr. Lewis guilty of attempted first degree murder but changed that finding to not guilty on Mr. Lewis's motion to reconsider. The trial court sentenced Mr. Lewis to concurrent sentences of 16 years on each of the aggravated discharge convictions.

¶ 26                               II. JURISDICTION

¶ 27        Mr. Lewis was sentenced on February 19, 2016, and timely filed his notice of appeal on March 3, 2016. This court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments of conviction in criminal cases.

III. ANALYSIS

Mr. Lewis's sole claim on appeal is that the State violated his right to confront witnesses against him by calling Mr. Zielinski to testify about Ms. Kane's conclusions, leaving him with no opportunity to cross-examine Ms. Kane, who was the real witness against him. Whether a defendant's sixth amendment right to confrontation was violated is a question of law that we review *de novo*. *People v. Barner*, 2015 IL 116949, ¶ 39.

The State argues that Mr. Lewis has forfeited this issue because he did not object to Mr. Zielinski's testimony at trial or raise the issue in a posttrial motion. See *People v. Leach*, 2012 IL 111534, ¶ 60 ("A defendant is not entitled to review of a claimed error unless he has made a timely objection at trial and raised the issue in a posttrial motion."). Mr. Lewis acknowledges his failure to object but argues that we may nonetheless review his claim as plain error or because his trial counsel was ineffective for failing to object. Our first step in a plain error analysis, generally, is "determining whether there was a clear or obvious error at trial." *People v. Sebby*, 2017 IL 119445, ¶ 49. We start there.

## A. Clear and Obvious Error

"The sixth amendment to the United States Constitution provides that [i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him." (Internal quotation marks omitted.) *Barner*, 2015 IL 116949, ¶ 40. "This portion of the sixth amendment is known as the confrontation clause and applies to the states through the fourteenth amendment." *Id.*

In *Crawford v. Washington*, 541 U.S. 36, 68-69 (2004), the United States Supreme Court held that out-of-court statements by witnesses that qualify as testimonial are barred at trial under the confrontation clause, unless that witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. Since *Crawford*, the Court has issued three opinions that address whether scientific reports are testimonial under *Crawford*. Each of these opinions was issued by a closely divided Court, and the dissenters from the earlier cases formed the plurality in the latest case. This line of cases forms the core of the parties' arguments in this case as to whether Mr. Lewis's sixth amendment rights were violated.

In *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307, 311 (2009), the Court held that forensic reports concluding that a substance seized by police was cocaine were testimonial under the sixth amendment. The majority held that the documents were "functionally identical to live, in-court testimony" and "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." (Internal quotation marks omitted.) *Id.* at 310-11.

In *Bullcoming v. New Mexico*, 564 U.S. 647, 653 (2011), the prosecution introduced into evidence a report of the petitioner's blood-alcohol level, certified by the analyst who completed the report. That analyst did not testify at trial; instead, the state introduced the report through the testimony of another scientist who "had neither observed nor reviewed" the report's analysis. *Id.* at 655. The Court concluded that this "surrogate testimony" by the nonperforming scientist did not satisfy the confrontation clause because it "could not convey what [the performing scientist] knew or observed about the events his certification concerned, *i.e.*, the particular test and testing process he employed." *Id.* at 661.

¶ 36    Then, in *Williams v. Illinois*, 567 U.S. 50, 56-58 (2012), the Court held that use of a Cellmark report of the defendant's DNA profile, which was then used by an expert to conclude that this profile matched the DNA on swabs taken from a rape victim, did not violate the confrontation clause. The plurality of the Court concluded that the Cellmark report was not testimonial because when the Cellmark "lab technicians are asked to work on the production of a DNA profile, they often have no idea what the consequences of their work will be." *Id.* at 85. Our supreme court explained that plurality in its own decision in *Leach*, stating:

> "When we must determine whether a forensic report is testimonial in nature, the *Williams* plurality instructs us to apply an objective test, looking for 'the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances.' [Citation.] If this inquiry reveals that the forensic report was 'made for the purpose of proving the guilt of a particular criminal defendant at trial' [citation], it is testimonial." *Leach*, 2012 IL 111534, ¶ 120 (quoting *Williams*, 567 U.S. at 84).

¶ 37    This line of cases supports Mr. Lewis's argument that Mr. Zielinski's surrogate testimony regarding Ms. Kane's conclusions violated Mr. Lewis's right to confrontation. Ms. Kane's report was prepared after Mr. Lewis was arrested and for the primary purpose of obtaining evidence to be used against Mr. Lewis to prove his guilt at trial. During Mr. Zielinski's testimony, it was clear he was presenting Ms. Kane's conclusions and that all that he could offer was that he agreed with them and had done "some of the verification." Mr. Zielinski never saw the dirty, jammed Glock handgun that Ms. Kane analyzed. Instead, he testified that "[a]ccording to [her] reports and notes," it was "inoperable as received" because there was "debris" in the weapon. He also never analyzed the fit between that gun and the Sellier & Bellot cartridge case that was recovered but instead testified that Ms. Kane's "examination concluded that" the cartridge case recovered from the gangway was fired from the Glock. As was the case in *Bullcoming*, 564 U.S. at 661, this was "surrogate testimony" that violated Mr. Lewis's sixth amendment right to confront the witness who had analyzed the gun and cartridge case and reached this conclusion.

¶ 38    The State insists that Mr. Zielinski was not a surrogate witness at all, but simply testified to his own expert conclusions after reviewing Ms. Kane's file. At times during his testimony, Mr. Zielinski did state his own opinions based on his own expertise—for example, he testified about the Illinois State Police laboratory's quality assurance program and demonstrated what a stovepiped weapon looks like. But the crux of Mr. Zielinski's testimony—and the State's primary reason for calling him to testify—was to present the conclusions of the firearms identification report as to the condition of the Glock and the fact that one of the recovered cartridge cases was fired from it.

¶ 39    The State also argues that under United States Supreme Court precedent there is no confrontation clause violation because the lab report and case file were "informal." This "informality" argument relies almost entirely on Justice Thomas's specially concurring opinion in *Williams*, which is not controlling authority. See *Leach*, 2012 IL 111534, ¶ 120.

¶ 40    The State also points to what it describes as "the neutrality and ubiquity of modern forensic techniques." The State offers no support for this description and, indeed, the National Research Council of the National Academies (NRC) has concluded that firearms identifications are "always done through direct physical comparison of the evidence by a firearms examiner [and] not the computer analysis of images," involve "subjective qualitative judgments by

- 8 -

examiners," and result in conclusions that are "subjective decision[s] based on unarticulated standards and no statistical foundation for estimation of error rates." National Research Council of the National Academies, Strengthening Forensic Science in the United States: A Path Forward (2009), https://www.ncjrs.gov/pdffiles1/nij/grants/228091.pdf [https://perma. cc/YD3K-FYHJ].

¶ 41  The United States Supreme Court recognized these same qualities of forensic science in *Melendez-Diaz*, acknowledging that there may be "other ways—and in some cases better ways—to challenge or verify the results of a forensic test. But the Constitution guarantees one way: confrontation." *Melendez-Diaz*, 557 U.S. at 318. Relying in part on the same report from the NRC, the Supreme Court refuted the respondent's claim that scientific testing was neutral and reliable, observing that "[f]orensic evidence is not uniquely immune from the risk of manipulation." *Id.*

¶ 42  The State also points to two decisions from our own supreme court that have found certain forensic reports or testimony about forensic reports were nontestimonial: *Leach*, 2012 IL 111534 and *Barner*, 2015 IL 116949. We find both cases to be distinguishable.

¶ 43  In *Leach*, the court held that an autopsy report was nontestimonial because it "was (1) not prepared for the primary purpose of accusing a targeted individual or (2) for the primary purpose of providing evidence in a criminal case." *Leach*, 2012 IL 111534, ¶ 122. And in *Barner*, the court found no confrontation clause violation when State witnesses testified to their own opinions and conclusions after reviewing the results of underlying testing completed by nontestifying scientists. *Barner*, 2015 IL 116949, ¶¶ 2, 28-30, 59. The court concluded that the underlying reports were not testimonial because they were "produced before any suspect was identified" in the case and were "not sought for the purpose of obtaining evidence to be used against [the] defendant." *Id.* ¶ 62.

¶ 44  Here, in stark contrast to both of these cases, Ms. Kane's report *was* prepared with a targeted individual in mind, Mr. Lewis, and for the purpose of providing evidence in the criminal case against him. Those cases do not help the State here.

¶ 45  Finally, we note that, although the parties do not discuss this issue, this testimony was hearsay that does not fall within any hearsay exception of which we are aware. See Ill. Rs. Evid. 801(c) (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011); R. 803 (eff. Sept. 28, 2018); R. 804 (eff. Jan. 1, 2011). Mr. Zielinski was clearly testifying to Ms. Kane's opinions and conclusions and offering those for the truth of the matter asserted. Such surrogate testimony is simply not admissible, regardless of whether the lab report on which Mr. Zielinski based his testimony was itself testimonial under *Crawford*. Ill. Rs. Evid. 801(c) (eff. Oct. 15, 2015); R. 802 (eff. Jan. 1, 2011).

¶ 46                                                      B. Plain Error

¶ 47  Mr. Lewis did not object to Mr. Zielinski's testimony at trial. If he had done so, and his objection had been sustained, the State would have had options: it might have simply gone without this evidence, it might have found a way to compel Ms. Kane to testify, or it might have negotiated a plea with Mr. Lewis. Giving the State an opportunity to correct an error before evidence is presented at trial is one of the reasons that an objection is generally required to preserve an evidentiary issue on appeal. *People v. Bush*, 214 Ill. 2d 318, 332 (2005). And this is why Mr. Lewis must make an additional showing, under the plain error doctrine, for review on appeal after failing to object to this testimony at trial.

¶ 48    Here, although we have found error occurred at trial, this error simply does not rise to the level of plain error in this case. Plain error occurs where either the evidence was "so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or the error was "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." (Internal quotation marks omitted.) *Sebby*, 2017 IL 119445, ¶ 48. Under either prong, the burden of persuasion rests with the defendant. *People v. Herron*, 215 Ill. 2d 167, 187 (2005).

¶ 49    The evidence here was not closely balanced. Officers Gamez's and Gregoire's accounts of their interactions with Mr. Lewis were generally consistent—both officers identified Mr. Lewis as the individual they chased, who fired a gun in their direction, and whom they eventually arrested—and the court specifically found their testimony to be credible. Even after excluding Mr. Zielinski's improper testimonial hearsay, the remaining physical evidence corroborates the officers' testimony: GSR was recovered from both sleeves of Mr. Lewis's jacket; a gun was found 20 feet away from where Mr. Lewis had fallen; seven fired Winchester 9-millimeter Luger cartridge cases, the type used by police officers, were found around the crime scene—six in the backyard and another in the alley—corroborating Officer Gamez's testimony that he fired at Mr. Lewis six or seven times; and a fired cartridge case of a different brand—a Sellier & Bellot 9-millimeter Luger—was found in the gangway where the officers testified Mr. Lewis fired his gun. In addition, Officer Ryan, who recovered the Glock, provided first-hand testimony about his examination of the Glock, saying that it had experienced a "doublefeed" and that it was jammed. Although this testimony was not as technical as the hearsay provided by Mr. Zielinski, it overlapped some of the significant details.

¶ 50    Mr. Lewis claims that Officers Gamez and Gregoire "contradicted one another on crucial facts"—specifically, who shot at whom and in what order, noting that Officer Gregoire testified "that after [Mr.] Lewis fired the first time, [Officer] Gamez immediately fired a shot back," while Officer Gamez testified that he only fired at Mr. Lewis when Mr. Lewis was preparing to fire at him for the third time. We find this to be, at most, a minor inconsistency, and understandable considering the intense circumstances of the chase and the officers' differing vantage points; Officer Gamez chased Mr. Lewis the entire time while Officer Gregoire took a different route in an attempt to intercept Mr. Lewis.

¶ 51    Mr. Lewis also draws our attention to Officer Gregoire's description of Mr. Lewis's gun as "blue steel," noting that the recovered weapon that was shown at trial was black. However, Mr. Lewis has failed to demonstrate that this evidence is, in fact, inconsistent. *Cf. People v. Rodriguez*, 267 Ill. App. 3d 942, 948 (1994), *rev'd on other grounds*, 169 Ill. 2d 183 (1996) (noting testimony that "a bluesteel revolver is black in color"). The evidence at Mr. Lewis's trial was not so closely balanced that Mr. Zielinski's testimony threatened to tip the scales of justice against Mr. Lewis.

¶ 52    Nor do we find second-prong plain error. Under the second prong, prejudice is presumed "because of the importance of the right involved." *Herron*, 215 Ill. 2d at 187. But this court has held that *Crawford* errors do not rise to the level of second-prong plain error. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 87. The United States Supreme Court has also held that "the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case." *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986).

¶ 53    In his petition for rehearing, Mr. Lewis cites several decisions of this court and our supreme court's decision in *People v. Lucas*, 151 Ill. 2d 461, 490 (1992), which have applied a second-prong plain error analysis to a *Crawford* error at trial. However, we think more recent and controlling case law makes clear that these decisions do not control here. Our supreme court has explained that second-prong plain error is a "structural error" that the court has defined as "a systemic error which serves to erode the integrity of the judicial process and undermine the fairness of defendant's trial." (Internal quotation marks omitted.) *People v. Thompson*, 238 Ill. 2d 598, 613-14 (2010). The supreme court has also explicitly stated that the admission of hearsay evidence in violation of *Crawford* is not a "structural error." In *People v. Patterson*, 217 Ill. 2d 407, 424-25 (2005), the court recognized that admission of evidence that did not conform with the confrontation clause is not a "structural defect" but rather a "trial error," subject to a harmless error analysis. Thus, admission of hearsay evidence that violates *Crawford* is "plain error" only where the evidence is closely balanced.

¶ 54                           C. Ineffective Assistance of Counsel

¶ 55    Mr. Lewis also attempts to overcome his failure to object to Mr. Zielinski's testimony through a claim that his trial counsel was ineffective for failing to object. To succeed on a claim of ineffective assistance, a defendant must show both that (1) his counsel's performance was deficient and (2) he was prejudiced by that deficient performance. *People v. Banks*, 2016 IL App (1st) 131009, ¶ 123 (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). Our supreme court has noted that the analysis for an ineffective assistance of counsel claim based on an evidentiary error is similar to the analysis for first-prong plain error "insofar as a defendant in either case must show he was prejudiced." *People v. White*, 2011 IL 109689, ¶ 133. A defendant shows prejudice in this context by demonstrating that "but for counsel's insufficient performance, the result of the proceeding would have been different." *Banks*, 2016 IL App (1st) 131009, ¶ 123.

¶ 56    We have already found that, even without Mr. Zielinski's testimony, the evidence presented at Mr. Lewis's trial—the officers' testimony and the uncontested physical evidence—was not closely balanced such that the introduction of the testimony prejudiced him. Mr. Lewis thus cannot show that but for trial counsel's failure to object to Mr. Zielinski's testimony, the outcome of the trial would have been different. Therefore, Mr. Lewis's claim of ineffective assistance of counsel fails.

¶ 57                                  IV. CONCLUSION

¶ 58    For the foregoing reasons, we affirm Mr. Lewis's convictions.

¶ 59    Affirmed.