2021 IL App (1st) 172090

No. 1-17-2090

April 26, 2021

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 19055 |
| | ) | |
| JASON CONWAY, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE WALKER delivered the judgment of the court, with opinion.
Justice Hyman concurred in the judgment and opinion.
Justice Pierce dissented, with opinion.

**OPINION**

¶ 1     After a bench trial, the trial court found Jason Conway guilty of violating the armed habitual criminal statute. 720 ILCS 5/24-1.7 (West 2014). Conway challenges the sufficiency of the evidence, and he argues that the trial court erred by (1) giving a police officer's testimony greater weight solely because of the officer's job, (2) allowing one expert to testify about the results of another expert's test of a swab, and (3) failing to inquire sufficiently into Conway's

posttrial claim that he received ineffective assistance of counsel. We find the evidence sufficient to convict. However, we hold that the trial court's unsupported assertions about the special perceptual powers of police officers require reversal and remand for a new trial.

¶ 2                                    I. BACKGROUND

¶ 3      Around noon on November 2, 2015, Chicago Police Officer Donald Story and several other officers entered a house on Monroe Street in Chicago. They encountered several Black men and women in the house. Officers arrested Conway on the first floor and found car keys in his pocket. Story went to the basement, where he saw a purse strap hanging between two mattresses. He pulled the strap and found two guns in the purse. Police charged Conway with violating the armed habitual criminal statute. 720 ILCS 5/24-1.7 (West 2014).

¶ 4      Defense counsel filed a motion to suppress the evidence seized in the warrantless search of the house on Monroe Street. The trial court denied the motion, in part because Conway did not live in the house and therefore had no privacy rights there.

¶ 5      At the bench trial, Story testified that on November 2, 2015, he stopped his car on Monroe Street, and from 150 feet away, he saw a man shoot at a moving car. After the car sped off, the shooter, who wore a blue hoodie, opened the door of a car on the street and reached inside before going into the house on Monroe Street. A number of officers responded to Story's call for backup. All went into the house the shooter had entered. Story saw the blue hoodie on the floor next to Conway. The car keys retrieved from Conway's pocket fit the car into which Story saw the shooter reach. Story identified Conway in court as the shooter.

¶ 6      Police found seven spent shell casings on the ground in front of the house. A firearms expert testified that the casings came out of one of the guns found in the purse Story found in the basement of the house on Monroe Street.

¶ 7 An officer swabbed Conway's hands and the blue hoodie and sent the swabs to the lab for testing. Scott Rochowicz, an expert on trace chemistry, testified that he did not test the swabs, but he reviewed the notes Robert Burke made when Burke tested the swabs. Burke had found gunshot residue in one sample labeled as coming from the hoodie and in the sample labeled as control, but not in the second sample from the hoodie and not in either sample from Conway's hands. Rochowicz testified:

> A. "[Burke] made notes that it looks like the left back sample along with the control sample were not used in the manner in which they were submitted.
>
> Q. And what does that mean?
>
> A. Basically it means he believes that those samples may have been switched during their use."

¶ 8 Rochowicz agreed with Burke's conclusion that the hoodie bore gunshot residue and Conway's hands did not.

¶ 9 Defense counsel did not object to testimony about the gunshot residue test. The court elicited Rochowicz's clarification that he did not test the samples, but in accord with standard peer review, he read Burke's notes regarding Burke's testing.

¶ 10 The State presented evidence that Conway had two prior convictions for Class 1 felonies of possession and delivery of controlled substances.

¶ 11 The court noted that the case rested largely on the credibility of Story's eyewitness identification of Conway as the shooter. The court stated:

"The officer, who is a trained police officer, is not a civilian, testified that he was in a position to immediately react when the shots were fired and saw the shots being fired. ***.

***

*** The officer identified it specifically with regard to the sweatshirt, and apparently the sweatshirt does, as I stated earlier, have some tricomponent parts that are indicative of coming into contact with gunpowder residue.***

***

I do find that the officer was not startled, he was not in a situation where his perception might have been affected or that he might have been distracted. Again, he is a professional. He is a law enforcement official, which I think is something that I can take into consideration as compared to an individual who's never had any such training and the dangers of false identification become more concerning then with a police officer. That is not a general statement. That is specifically to this officer. I believe his testimony is clear, credible, and convincing with regard to this."

¶ 12    The circuit court found Conway guilty of violating the armed habitual criminal statute. In allocution before sentencing, Conway said:

"[Defense counsel] lied to you, your Honor. *** [W]e supposed to be here to hear the motion to reconsider [the denial of the motion to suppress]. They made me go to trial. We wasn't even prepared for trial, your Honor.

***

*** I don't know the reason I was pushed into trial. I didn't get the chance to send nobody out to get anything done, your Honor."

¶ 13    Conway said his attorney told him that the judge would reconsider the motion to suppress during the trial. Conway told his attorney the name of the owner of the house on Monroe Street. The court asked counsel what he did with the information, and the attorney answered: "Judge, the fact that some lady owned the house I did not think was relevant as to whether he was the gentleman that fired the gun outside the house and ran inside of the house."

¶ 14    Conway explained that he expected that, on the motion for reconsideration of the denial of the motion to suppress, he could assert that he had a right to privacy as a guest in his friend's home. Counsel responded:

"I would rather consider it after a conviction because for all we know, we wouldn't have to do a motion to reconsider if the court found him not guilty. It would be moot.

So now we file it at the end, hoping the court changes his mind and vacates the guilty."

¶ 15    The circuit court found that counsel had not provided deficient representation and the court would have denied the motion to reconsider if counsel had made such a motion. The court sentenced Conway to 14 years in prison. Conway now appeals.

¶ 16                                    II. ANALYSIS

¶ 17    Conway argues on appeal: (1) the evidence does not support the conviction, (2) the court showed bias and considered matters outside the record in assessing Story's credibility, (3) the court erred by allowing Rochowicz to testify to Burke's conclusions, (4) counsel provided ineffective

assistance, and (5) the court did not sufficiently inquire into Conway's posttrial allegations that he received ineffective assistance of counsel.

¶ 18                                A. Sufficiency of the Evidence

¶ 19    Conway emphasizes that Story saw the shooter for only a few seconds from 150 feet away and, at that distance, Story could not have seen the shooter's face clearly. Story saw several Black men in the house the shooter entered. Story did not explain what distinguished those men from the shooter. Because of the time it took for back up to arrive, the shooter could have hidden the gun in the purse, taken off the hoodie, and left by the back door without Story seeing him depart.

¶ 20    Based on a distant eyewitness identification, the State presented a weak case, and the corroborating evidence presents some problems. According to the State, the shooter thought clearly enough to take off the hoodie, wash the gunshot residue off his hands, and hide the gun between mattresses in the basement, but he sat right next to the hoodie and failed to wash the gunshot residue off the hoodie. While we find the State's characterization of the shooter odd, we find that the discovery of the gun, Conway's proximity to the hoodie, and the testimony that the shooter reached into the car for which Conway held the keys suffices as corroboration of the eyewitness identification. We find the evidence closely balanced but sufficient to support the conviction.

¶ 21                                B. Officer's Credibility

¶ 22    Conway argues that the trial judge's comments show that the judge harbored a pro-police bias and based his findings on assertions not supported by any evidence in the record. No evidence supports the assertion that police officers have any advantage over other witnesses in identifying strangers they have seen once or that officers are less prone to false identifications. See *United States v. Veal*, 182 F.3d 902 (2d Cir. 1999) (expert's proffered testimony that "police officers are

not superior eye witnesses" properly excluded as a matter of common sense). The trial judge here stated, "He is a law enforcement official, which I think is something that I can take into consideration as compared to an individual who's never had any such training and the dangers of false identification ***. That is not a general statement. That is specifically to this officer."

¶ 23    We find that no evidence distinguished Story's ability to make identification from the abilities of any other officer. Story's emphasis on his unobstructed view of the shooter's face shows that he intended the court to rely on his ability to recognize facial features of a person he saw for five seconds from 150 feet. Courts have excluded expert testimony on the effect of distance on the ability to identify a person, reasoning that "all jurors know that certain factors, such as lighting, distance, and duration, may affect the accuracy of identifications." *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985); see *People v. Enis*, 139 Ill. 2d 264 (1990). When courts have considered testimony on the effect of distance, experts have stated that "for people with normal vision the ability to identify faces begins to diminish at approximately 25 feet" (*State v. Cabagbag*, 277 P.3d 1027, 1036 n.11 (Haw. 2012)); "impairments and difficulty in accuracy are apparent when the perpetrator is at least 30 yards away from the eyewitness." *State v. Holmes*, 2012 WL 4097296, at *6-7 (Del. Super. Ct. Sept. 19, 2012); and "at about 150 feet away, a witness's ability to correctly identify somebody falls to essentially zero." *Benson v. State*, 88 N.E.3d 1078 (Ind. Ct. App. 2017) (table).

¶ 24    Story testified that he knew Conway shot the gun because he saw the shooter's face from 150 feet away for five seconds, and Conway, like the shooter, wore blue jeans. Conway also sat next to a blue hoodie which Story identified as the hoodie the shooter wore. Story did not notice any unique characteristics of the blue jeans the shooter wore.

¶ 25    The appellate court has outlined the relevant principles:

"The right of a defendant to an unbiased, open-minded trier of fact is so fundamental to our system of jurisprudence that it should not require either citation or explanation. It is rooted in the constitutional guaranty of due process of law [citation], and entitles a defendant to a fair and impartial trial before a court which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial." (Internal quotation marks omitted.) *People v. McDaniels*, 144 Ill. App. 3d 459, 462 (1986).

¶ 26    The judge here relied on his belief that the officer's training gave him the ability to identify facial characteristics from 150 feet away with only a few seconds to observe the face. The judge's comments show that the judge used "an underlying presumption favoring the exercise of government power," (Morgan Cloud, *The Dirty Little Secret*, 43 Emory L.J. 1311, 1340 (1994)), and "work[ed] under the principle that police officers are presumptively trustworthy." David N. Dorfman, *Proving the Lie: Litigating Police Credibility*, 26 Am. J. Crim. L. 455, 472 (1999). Just as "a prosecutor may not argue that a witness is more credible because of his status as a police officer" (*People v. Clark*, 186 Ill. App. 3d 109, 115-16 (1989)), a court cannot find a witness more credible solely because of his status as a police officer. No evidence supports the judge's finding that Story's training gave him a better ability than any other witness to identify a face he saw for a few seconds from 150 feet away.

¶ 27    Hence, there was no evidence in the record supporting the trial judge's finding that this police officer was better equipped than lay witnesses to identify a stranger's face in seconds from 150 feet away. Story's identification belies the reality of human cognition because reliability or unreliability hinges initially on witness's proximity to the perpetrator and the length and conditions for sound observation. See *People v. Tomei*, 2013 IL App (1st) 112632, ¶ 40.

¶ 28    We find that the record shows the "judge harbored preconceived notions regarding the veracity of the [prosecution] witnesses which led him to reject [the] defense without due consideration. We also find that defendant was not afforded a fair and impartial trial." *People v. Kennedy*, 191 Ill. App. 3d 86, 91 (1989). Just as "a prosecutor may not argue that a witness is more credible because of his [or her] status as a police officer" (*Clark*, 186 Ill. App. 3d at 115-16), a trial judge cannot find a witness more credible solely because of his or her status as a police officer.

¶ 29    The judge's comments show "an underlying presumption favoring the exercise of government power" (Morgan Cloud, *The Dirty Little Secret*, 43 Emory L.J. 1311, 1340 (1994)), and "work[ed] under the principle that police officers are presumptively trustworthy." David N. Dorfman, *Proving the Lie: Litigating Police Credibility*, 26 Am. J. Crim. L. 455, 472 (1999). Accordingly, we remand to the presiding judge of the criminal division for reassignment and a new trial. Under Illinois Supreme Court Rule 366(a)(5) (eff. Feb. 1, 1994), we may, in our discretion, direct that this case be reassigned to a new judge on remand. *People v. Serrano*, 2016 IL App (1st) 133493, ¶ 45. We exercise that discretion here because of the trial judge's pronounced bias in favor of police testimony. Because of our disposition on this issue, we do not address the remaining arguments on appeal.

¶ 30                              III. CONCLUSION

¶ 31    The trial judge improperly relied on unsupported assertions about the effects of police training on the ability to identify a face seen for a few seconds from 150 feet away. Because of the trial judge's pronounced bias in favor of police testimony, we remand the cause to the presiding judge of the criminal division of the circuit court, with instructions to assign this case to a different judge on remand.

¶ 32    Reversed and remanded with instructions.

¶ 33    JUSTICE PIERCE, dissenting:

¶ 34    This is essentially a one-witness identification case with circumstantial evidence in support of the identification. The eyewitness is a police officer who, while on a surveillance assignment, heard gunshots about 150 feet away. He looked in the direction of the gunshots and observed the front and side of the shooter's face; the clothing he was wearing, including a distinctive sweatshirt; and the type of weapon fired. He also observed that, after the shooting, the shooter reached into a car and then ran into a building. The officer called for assistance, promptly entered the building, and found the defendant on the floor with a sweatshirt similar to the one worn by the shooter lying at his feet. A firearm tied to shell casings found at the scene of the shooting was found in the building, and a search of defendant produced the keys to the car that the shooter reached into after the shooting.

¶ 35    With no other witness to the shooting and no witness offering conflicting testimony, the majority finds this evidence sufficient to sustain a conviction. However, it orders a new trial based on a fanciful interpretation of the trial judge's credibility determination of the sole eyewitness. I can only conclude that, rather than giving the circuit court's credibility determination the deference to which it is entitled, the majority orders a retrial based on a finding, with no persuasive explanation, that an experienced trial judge is biased in favor of a police officer witnesses merely because the witness is a police officer. Either the single eyewitness was credible, or he was not. Either he saw what he testified to, or he did not. That the witness was a police officer was a fact from which a reasonable inference could be drawn that he was trained to make accurate observations under stressful circumstances. This does not mean that the observations made were *per se* credible; even a trained professional can be wrong. But the majority's outcome-determinative approach is not supported by the record and is simply an end-around on the axiom

that, in a bench trial, the trial judge is in the best position to make credibility findings and is presumed to know the law. The majority decision here is nothing more than a mechanism for the majority to replace the circuit court's judgment with its own. I cannot agree with the majority's reasoning or conclusions—except that there was sufficient evidence from which the trier of fact could conclude that defendant was guilty beyond a reasonable doubt. I respectfully dissent.

¶ 36    To explain my reasoning, it is necessary to fully state the evidence at the bench trial. A review of the testimony shows that Officer Story testified that, at around 11:45 a.m. on November 2, 2015, he was working as a surveillance officer with a narcotics team when he saw defendant, from about 150 feet away, firing a handgun at a car. Officer Story had a clear and unobstructed view. He could see the front and left side of defendant's body and face. He testified regarding where defendant was in relation to him at time of the shooting and described the clothes that defendant was wearing: a multicolored light blue and "kind of greyish" hoodie and light blue jeans. Defendant approached a Pontiac parked in front of 3822 West Monroe Street, opened the door, leaned inside, and stepped away. Defendant returned to the Pontiac, reached inside, and then entered 3822 West Monroe Street. Officer Story also described the gun that defendant was holding as a black semi-automatic handgun.

¶ 37    When help arrived, Officer Story and the other officers first entered the wrong building but then entered 3822 West Monroe Street and saw defendant on the floor wearing a white t-shirt and the same jeans he was wearing earlier. The hoodie he was wearing earlier was on the floor near his feet. Defendant was arrested, and the keys to the Pontiac were found on defendant. In the basement, Officer Story found a purse containing two handguns. One was a .40-caliber pistol with an empty magazine that appeared to be the same weapon Officer Story saw defendant shooting.

Officer Story recovered seven .40-caliber shell casings outside, which were later identified as having been fired from the .40-caliber weapon he recovered.

¶ 38    A summary of the circuit court's finding is that

"[i]t is clear that the shooter ran into the address where the defendant was found ***.

* * *

The shooter is inside. The officer sees the shooter run inside that place and the police subsequently go into that location. Also it's clear the gun used in the shooting is inside that same residence at 3822 West Monroe. There is no question about that.

The seven casings on the scene match up with the gun that's found, the .40-caliber gun that's found inside the address.

It's also clear to me that a sweatshirt *** was found inside the same address where the defendant was, where the gun was, where the shooter ran into."

¶ 39    The court then stated that "it boils down to an ID case" that occurred at 11:45 a.m., during "natural sunlight," and "it does appear that the officer did not have any obstructions in the line from where he was to the—where he observed the shooter shoot." The officer was "about 150 feet away," a "half of a football field." The court found that:

"There is corroborative evidence of this, but essentially as argued, this is a single-finger case.

I do find that the officer did have a unique opportunity to view the shooter in this matter. I do find that the officer's testimony with regard to the identity of the shooter was in fact clear, credible, and convincing.

I do find that the officer was not startled, he was not in a situation where his perception might have been affected or that he might have been distracted. Again, he is a professional. He is a law enforcement official, which I think is something that I can take into consideration as compared to an individual who's never had any such training and the dangers of false identification become more concerning then [*sic*] with a police officer. That is not a general statement. That is specifically to this officer. I believe his testimony is clear, credible, and convincing with regard to this."

¶ 40    Contrary to the majority's opinion, the trial judge did not make "unsupported assertions about the special perceptual powers of police officers" (*supra* ¶ 1) or find "that Story's training gave him a better ability than any other witness to identify a face he saw for a few seconds from 150 feet away" (*supra* ¶ 26). These unsupported characterizations of the circuit court's comments form the basis of the majority's thinly reasoned conclusion that the " '[trial] judge harbored preconceived notions regarding the veracity of the [prosecution] witnesses which led him to reject [the] defense without due consideration.' " *Supra* ¶ 27 (quoting *People v. Kennedy*, 191 Ill. App. 3d 86, 91 (1989)). The majority isolates the trial judge's actual findings to find bias where none is evident and without regard for context. As the record shows, the trial judge's findings were plainly based on the evidence before it: that Officer Story was "not startled, he was not in a situation where his perception might have been affected or that he might have been distracted."

¶ 41    When considering identification testimony, all the circumstances should be considered, including the opportunity to observe the offender at the time of the crime, the witness's degree of attention at the time of the crime, the accuracy of the witness's prior description of the offender, the level of certainty at the identification confrontation, and the time between the observation and the confrontation. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 42    Here, the trial judge found that Officer Story's testimony was "clear, credible, and convincing." In doing so, the circuit court found that Officer Story—who was a trained police officer on a surveillance assignment—looked toward the gunshots and observed the shooter, his characteristics, his clothing, and his movements during and after the shooting. In other words, the circuit court found that Officer Story was paying attention, a factor that is entirely appropriate to consider when evaluating identification testimony. *Id.* The circuit court did not find that Officer Story is better at observing events than a civilian because he is a police officer or that a civilian would be unable to make the same observations. The circuit court credited Officer Story's testimony because he observed the shooting while it was happening and testified as to what he saw. The circuit court considered Officer Story's testimony that he saw defendant's face from the front and left side during the shooting and found that testimony—along with the remainder of Officer Story's identification testimony—to be "clear, credible, and convincing."

¶ 43    The majority implies that it would be improbable for a person to recognize another person from a distance of 150 feet but does little to substantiate that belief, other than relying on quotes from expert testimony proffered in different cases from other states. *Supra* ¶ 23. I fully agree with the State that evidence concerning the reliability of eyewitness testimony was not presented for the circuit court's consideration here or that this argument was fully developed in the record and, therefore, should not be considered by this court on appeal. See *People v. Mehlberg*, 249 Ill. App. 3d 499, 531-53 (1993) ("A reviewing court must determine the issues before it on appeal solely on the basis of the record made in the trial court."). We are a court of review and should generally refrain from considering evidence that the circuit court did not have an opportunity to consider when making its judgment. Officer Story was fully cross-examined on his identification testimony, and the circuit court, having considered all of the evidence, found the testimony "clear, credible,

and convincing." There was nothing arbitrary, capricious, or improbable about Officer Story's testimony, and certainly nothing in the record supports a finding of bias on the part of the circuit court in finding that the testimony was credible. The majority implies that the circuit court's finding that Officer Story, a police officer, testified credibly is the same thing as finding Officer Story's testimony credible because he is a police officer. The record reflects that the circuit court found Officer Story's testimony was credible because, as a police officer performing his job, he was paying attention to what was happening, he was not distracted, and his perception was not affected. Nothing suggests that the trial judge believed Officer Story possessed enhanced perceptual powers by virtue of having been trained as a police officer.

¶ 44 The majority attempts to make a significant point when it states "[n]o evidence supports the judge's finding that Story's training gave him a better ability than any other witness to identify a face he saw for a few seconds from 150 feet away." *Supra* ¶ 26. That is not what the trial judge found. The trial judge commented that Officer Story "was not in a situation where his perception might have been affected or that he might have been distracted" and that, because he was paying attention to what was happening, "the dangers of false identification" were diminished in this case. Furthermore, if the majority means to say that, in a situation where there are two differing witness accounts, the trial judge should not elevate a police officer's testimony over that of a civilian, that is fine. But how is that relevant here, where the focus is solely on the trial judge's assessment of Officer Story's credibility? The majority sidesteps the issue of whether the trial judge's finding that Officer Story's testimony was credible was against the manifest weight of the evidence. Instead, the majority finds judicial bias where there is none. The majority allows its skepticism of Officer Story's testimony to override our obligation, as a court of review, to pay considerable deference to the circuit court's credibility findings when those findings are based on the evidence

presented in the circuit court. The fact that the circuit court did not share the majority's unsubstantiated skepticism is not a valid basis for overturning the circuit court's finding because the circuit court's finding is not against the manifest weight of the evidence.

¶ 45 The majority agrees with defendant "that the record shows the 'judge harbored preconceived notions regarding the veracity of the [prosecution] witnesses which led him to reject [the] defense without due consideration.' " Supra ¶ 28 (quoting *Kennedy*, 191 Ill. App. 3d at 91). But the trial judge's comments here bear little resemblance to the comments in *Kennedy*, where we faulted the trial judge for being biased and relying on matters outside of the record in making his credibility determinations regarding defense witnesses. *Kennedy*, 191 Ill. App. 3d at 90-91. We found:

"The trial judge classified the defense witnesses as thieves, drug addicts, fornicators and welfare recipients. However, nothing in the record supports these classifications. The trial judge must have guessed from the witnesses' clothing and mien that they were thieves, drug users, welfare recipients and fornicators. Alternatively, he must have relied on information outside of the record in evaluating the witnesses. The trial judge also seemed unwilling to believe the testimony of the defense witnesses because of their living arrangements and employment status. The defense witnesses apparently lacked credibility because the trial judge believed that they were unemployed drug addicts and welfare recipients. Also, the witnesses lacked credibility because the trial judge believed that their children were born out of wedlock. We are of the opinion that the trial judge harbored preconceived notions regarding the veracity of the defense witnesses which led him to reject defendant's alibi defense without due consideration. We also believe that defendant was not afforded a fair and impartial trial." *Id.* at 91.

¶ 46    Here, unlike in *Kennedy*, the trial judge gave a considered explanation for his credibility determination that was based on the evidence before him. The majority fails to point to even a single statement from the trial judge that evinced a "preconceived notion" in favor of the State or a "pro-police bias," other than the circuit court's observation that Officer Story was a police officer. I do not agree with the majority that the record supports a finding that the trial judge exhibited any bias. Therefore, I would find that defendant is not entitled to a new trial on this basis. Rather than encouraging the circuit court to explain its decisions, this decision will cause trial judges to make conclusory credibility determinations to avoid unsubstantiated interpretations of its findings by a reviewing court.

¶ 47    For the foregoing reasons, I respectfully dissent.

**No. 1-17-2090**

| | |
|---|---|
| **Cite as:** | *People v. Conway*, 2021 IL App (1st) 172090 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CR-19055; the Hon. Charles P. Burns, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Patricia Mysza, and Gavin J. Dow, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and David H. Iskowich, Assistant State's Attorneys, of counsel, and Sandi Tanoue, law school graduate), for the People. |