2023 IL App (1st) 172090-U

SIXTH DIVISION

December 15, 2023

No. 1-17-2090

**NOTICE**:  This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 19055 |
| | ) | |
| JASON CONWAY, | ) | Honorable |
| | ) | Charles P. Burns, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justices Hyman and Tailor concurred in the judgment.

*Held:* On remand from the Illinois Supreme Court, we reverse defendant Jason Conway's conviction and remand for a new trial because the testimony of the State's gunshot residue expert violated Conway's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution.

¶ 1     After a bench trial, the circuit court found defendant Jason Conway guilty of armed habitual criminal (720 ILCS 5/24-1.7 (West 2014)) and sentenced him to 14 years' imprisonment. On direct appeal, Conway raised four claims: (1) the evidence was insufficient to sustain the verdict, (2) the

verdict should be reversed because the trial judge evidenced bias in favor of police testimony, (3) a Confrontation Clause violation, and (4) the court erred regarding his posttrial claim of ineffective assistance of counsel pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984). We found the evidence was sufficient to sustain the verdict, but reversed and remanded based on Conway's theory of judicial bias. *People v. Conway*, 2021 IL App (1st) 172090. The Illinois Supreme Court affirmed in part and reversed in part in *People v. Conway*, 2023 IL 127670, affirming our finding regarding the sufficiency of the evidence, but reversing the finding of bias, and remanded to this court for consideration of Conway's Confrontation Clause and *Krankel* claims. On remand, we find the testimony of the State's gunshot residue expert violated Conway's Confrontation Clause rights, and, accordingly, reverse and remand for a new trial.

¶ 2                                  I. BACKGROUND

¶ 3     We include only those facts necessary to resolve Conway's remaining claims. The below facts were relayed in our first opinion, *People v. Conway*, 2021 IL App (1st) 172090, unless otherwise indicated:

> "Around noon on November 2, 2015, Chicago police officer Donald Story and several
> other officers entered a house on Monroe Street in Chicago. They encountered several
> Black men and women in the house. Officers arrested Conway on the first floor and found
> car keys in his pocket. Story went to the basement, where he saw a purse strap hanging
> between two mattresses. He pulled the strap and found two guns in the purse. Police
> charged Conway with violating the armed habitual criminal statute. 720 ILCS 5/24-1.7
> (West 2014)." *Id.* ¶ 3.

"Defense counsel filed a motion to suppress the evidence seized in the warrantless search of the house on Monroe Street. The trial court denied the motion, in part because Conway did not live in the house and therefore had no privacy rights there." *Id.* ¶ 4.

"At the bench trial, Story testified that on November 2, 2015, he stopped his car on Monroe Street, and from 150 feet away, he saw a man shoot at a moving car. After the car sped off, the shooter, who wore a blue hoodie, opened the door of a car on the street and reached inside before going into the house on Monroe Street. A number of officers responded to Story's call for backup. All went into the house the shooter had entered. Story saw the blue hoodie on the floor next to Conway. The car keys retrieved from Conway's pocket fit the car into which Story saw the shooter reach. Story identified Conway in court as the shooter." *Id.* ¶ 5.

"Police found seven spent shell casings on the ground in front of the house. A firearms expert testified that the casings came out of one of the guns found in the purse Story found in the basement of the house on Monroe Street." *Id.* ¶ 6.

"An officer swabbed Conway's hands and the blue hoodie and sent the swabs to the lab for testing. Scott Rochowicz, an expert on trace chemistry, testified that he did not test the swabs, but he reviewed the notes Robert Burke made when Burke tested the swabs. Burke had found gunshot residue in one sample labeled as coming from the hoodie and in the sample labeled as control, but not in the second sample from the hoodie and not in either sample from Conway's hands. Rochowicz testified:

'A. [Burke] made notes that it looks like the left back sample along with the control sample were not used in the manner in which they were submitted.

Q. And what does that mean?

A. Basically it means he believes that those samples may have been switched during their use.' " *Id.* ¶ 7.

"Rochowicz agreed with Burke's conclusion that the hoodie bore gunshot residue and Conway's hands did not." *Id.* ¶ 8.

"Defense counsel did not object to testimony about the gunshot residue test. The court elicited Rochowicz's clarification that he did not test the samples, but in accord with standard peer review, he read Burke's notes regarding Burke's testing." *Id.* ¶ 9.

¶ 4     On remand, we further note that Rochowicz testified at trial that the Illinois State Police (ISP) peer review process requires that "once the case has actually been analyzed and a file along with report and notes has been generated, that report and notes will be given to another qualified examiner to review," and that examiner then reviews those materials "to ensure that the procedure manual has been followed as well as all of the conclusions that are issued in the reports can be verified or validated by the notes." Rochowicz's involvement in this matter came only through the peer review process.

¶ 5     Our prior opinion continued:

"The State presented evidence that Conway had two prior convictions for Class 1 felonies of possession and delivery of controlled substances." *Conway*, 2021 IL App (1st) 172090, ¶ 10.

"The court noted that the case rested largely on the credibility of Story's eyewitness identification of Conway as the shooter. The court stated:

'The officer, who is a trained police officer, is not a civilian, testified that he was in a position to immediately react when the shots were fired and saw the shots being fired.***

- 4 -

*** The officer identified it specifically with regard to the sweatshirt, and apparently the sweatshirt does, as I stated earlier, have some tricomponent parts that are indicative of coming into contact with gunpowder residue.***

I do find that the officer was not startled, he was not in a situation where his perception might have been affected or that he might have been distracted. Again, he is a professional. He is a law enforcement official, which I think is something that I can take into consideration as compared to an individual who's never had any such training and the dangers of false identification become more concerning then with a police officer. That is not a general statement. That is specifically to this officer. I believe his testimony is clear, credible, and convincing with regard to this.' " *Id.* ¶ 11.

"The circuit court found Conway guilty of violating the armed habitual criminal statute. In allocution before sentencing, Conway said:

'[Defense counsel] lied to you, your Honor. *** [W]e supposed to be here to hear the motion to reconsider [the denial of the motion to suppress]. They made me go to trial. We wasn't even prepared for trial, your Honor.

*** I don't know the reason I was pushed into trial. I didn't get the chance to send nobody out to get anything done, your Honor.' " *Id.* ¶ 12.

"Conway said his attorney told him that the judge would reconsider the motion to suppress during the trial. Conway told his attorney the name of the owner of the house on Monroe Street. The court asked counsel what he did with the information, and the attorney answered: "Judge, the fact that some lady owned the house I did not think was relevant as

to whether he was the gentleman that fired the gun outside the house and ran inside of the house." *Id.* ¶ 13.

"Conway explained that he expected that, on the motion for reconsideration of the denial of the motion to suppress, he could assert that he had a right to privacy as a guest in his friend's home. Counsel responded:

> 'I would rather consider it after a conviction because for all we know, we wouldn't have to do a motion to reconsider if the court found him not guilty. It would be moot.
>
> So now we file it at the end, hoping the court changes his mind and vacates the guilty.' " *Id.* ¶ 14.

"The circuit court found that counsel had not provided deficient representation and the court would have denied the motion to reconsider if counsel had made such a motion. The court sentenced Conway to 14 years in prison. Conway now appeals." *Id.* ¶ 15.

¶ 6      We further note on remand that during the *Krankel* inquiry, the circuit court asked Conway if he informed counsel of any additional witnesses he might want to call, and Conway answered affirmatively. Conway continued that he told counsel of two witnesses, Dion Richardson and the "lady" who owned the house. Counsel acknowledged he received this information, and informed the court that after doing so, he "indicated that to Mr. Conway, that's very interesting but not germane. You have to say that he wasn't the guy. I don't care who owns the house, he is not the guy that [is] running in there." Conway explained it was a previous attorney, not his trial counsel, who he believed provided ineffective assistance.

¶ 7                             II. ANALYSIS

¶ 8    On remand from the Illinois Supreme Court, we now address Conway's arguments that (1) Rochowicz's testimony violated his rights under the Confrontation Clause of the United States Constitution (U.S. Const., amend VI), and (2) the circuit court erred in finding he did not establish possible neglect during the *Krankel* hearing, or, alternatively, the court's *Krankel* inquiry was insufficient.

¶ 9    We begin with the Confrontation Clause claim. Conway acknowledges that he did not preserve this claim through a timely objection at trial and inclusion in a posttrial motion. See *People v. Sebby*, 2017 IL 119445, ¶ 48. He contends, however, that we may reach the claim on plain error review.

¶ 10    A reviewing court may consider a forfeited claim on appeal if it constitutes plain error. *Id.* Plain error review is appropriate where a clear or obvious error occurred at trial, and either (1) the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant, or (2) the error was so serious that it denied the defendant his right to a fair trial, regardless of the closeness of the evidence. *Id.* We must first determine whether a clear or obvious error occurred. *Id.* ¶ 49.

¶ 11    Conway claims that the admission of Rochowicz's testimony constituted a clear and obvious error because it denied him the right to confront the witnesses against him, guaranteed by both the United States Constitution (U.S. Const., amend. VI) and Illinois Constitution (Ill. Const. 1970, art. I, § 8). The United States Supreme Court established in *Crawford v. Washington*, 54 U.S. 36 (2004), that under the Confrontation Clause, testimonial hearsay is inadmissible unless the declarant is unavailable, and the defendant had a previous opportunity to cross-examine the declarant regarding the statements at issue. *Crawford*, 54 U.S. at 68-69.

¶ 12    Following *Crawford*, the Court has clarified the application of this principle to scientific reports in three opinions. First, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 307, 311 (2009), the Court held that three certificates of analysis identifying the substance at issue as cocaine, each sworn to before a notary public by an analyst, were testimonial statements for purposes of the defendant's criminal trial for drug trafficking. The Court explained that the certificates were equivalent to an affidavit affirming that the substance was cocaine, an official statement that was testimonial in nature because it would have been clear to an objective witness that the statement was made for use at a later trial. *Id.* at 310-11. The Court summarized, "under our decision in *Crawford*, the analysts' affidavits were testimonial statements, and the analysts were "witnesses" for the purposes of the Sixth Amendment." *Id.* at 311.

¶ 13    Next, in *Bullcoming v. New Mexico*, 564 U.S 647 (2011), the Court considered whether, "[T]he Confrontation Clause permit[s] the prosecution to introduce a forensic laboratory report containing a testimonial certification, made in order to prove a fact at a criminal trial, through the in-court testimony of an analyst who did not sign the certification or personally perform or observe the performance of the test reported in the certification." *Bullcoming*, 564 U.S. at 657. The Court ruled that the report could not be introduced in this manner, holding that such "surrogate testimony" is improper because "[t]he accused's right is to be confronted with the analyst who made the certification, unless that analyst is unavailable at trial, and the accused had an opportunity, pretrial, to cross-examine that particular scientist." *Id.* at 652. The Court explained that "surrogate testimony *** could not convey what [the testing scientist] knew or observed about the events his certification concerned, *i.e.,* the particular test and testing process he employed," or reveal "lapses or lies" in the testing scientist's account. *Id.* at 661-62. The Court also stressed that "A document created solely for an evidentiary purpose *** made in aid

of a police investigation, ranks as testimonial," and noted that the fact the report was "unsworn" was not dispositive of its nature. (Internal quotation omitted). *Id.* at 664. Regarding surrogate testimony, the Court explained that "New Mexico could have avoided any Confrontation Clause problem by asking [the surrogate] to retest the sample, and then testify to the results of his retest rather than to the results of a test he did not conduct or observe." *Id.* at 666.

¶ 14    Next, in *Williams v. Illinois*, 567 U.S. 50 (2012), a plurality of the Court found that testimony from an ISP forensic scientist that a DNA profile developed by the ISP matched a DNA profile developed by a third party (Cellmark, who provided its results in a report) was admissible because the testimony regarding the Cellmark report was not introduced for the truth of the matter asserted, but only to reveal the basis for the expert's opinion that the profiles matched. *Williams*, 567 U.S. at 57-58. The plurality also noted that as a second, independent basis for admissibility, the Cellmark report was non-testimonial because it "was produced before any suspect was identified," and thus "was sought not for the purpose of obtaining evidence to be used against [a] *** targeted individual." *Id.* at 58, 84. Justice Thomas's solo concurrence explained that he only concurred in the judgment, and on the basis that the Cellmark report was insufficiently formal to be considered testimonial, citing that "it is neither a sworn nor a certified declaration of fact." *Id.* at 104. The minority four justices, in a Justice Kagan opinion, found the situation "functionally identical" to *Bullcoming*, and contended the Cellmark report was testimonial both because it actually was introduced for the truth of the matter asserted, not merely the basis of an expert opinion, and because "the report is, in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial." *Id.* at 124, 126, 138.

¶ 15    In *People v. Leach*, 2012 IL 111534, the Illinois Supreme Court characterized the plurality and dissent in *Williams* as creating two separate "primary purpose" tests for courts to

use when considering whether a scientific report is testimonial—the plurality's view that "the primary purpose" must be to accuse a specific person, and the dissent's view that the primary purpose can be, more generally, to provide evidence for a future trial. *Leach*, 2012 IL 111534, ¶¶ 120-21.

¶ 16    Finally, in *People v. Lewis*, 2019 IL App (1st) 160864, another panel of this court helpfully synthesized the above precedent in a situation similar to this matter. There, the court considered the testimony of a forensic scientist from the ISP on the results of a firearm identification examination performed by a different scientist, but which the witness reviewed as part of the ISP's quality assurance program. *Lewis*, 2019 IL App (1st) 160864, ¶ 17. The witness agreed with the testing scientist's conclusions after reviewing the report. *Id.* The *Lewis* court decided this was testimonial evidence, reasoning "the report was prepared after [defendant] was arrested and for the primary purpose of obtaining evidence against [defendant]," and during the witness's testimony, "it was clear he was presenting [the testing scientist's] conclusions and that all he could offer was that he agreed with them," had not been involved first-hand in the testing at all, and did not perform subsequent testing himself. *Id.* ¶ 37. The *Lewis* court concluded, "this was surrogate testimony that violated [Lewis's] sixth amendment right to confront the witness who had [performed the test.]" (Internal quotation omitted.") *Id.* ¶ 37. It rejected the State's argument that the surrogate offered his own opinion because the "crux" of his testimony was "to present the conclusions of the firearm identification report." *Id.* ¶ 38. Finally, the court noted that under *Leach*, the report at issue was created with both the primary purpose of use as evidence generally, and to target Lewis specifically. *Id.* ¶ 44.

¶ 17    Here, the record shows Rochowicz did not participate in the original testing of the GSR samples, or perform new testing before he testified. Instead, he reviewed Burke's report as part

of the ISP peer review process, then testified regarding Burke's conclusions at Conway's trial. Burke's testing took place after Conway's arrest, and there is no indication that Burke was unavailable to testify or that Conway had the opportunity to cross-examine Burke in a previous proceeding.

¶ 18     On this record, we find that it was a clear or obvious error to admit Rochowicz's testimony regarding Burke's testing because such testimony violated Conway's sixth amendment right to confront the witnesses against him. This is a classic surrogate testimony situation which, as described in *Bullcoming* and confirmed by this court in *Lewis*, involves testimonial hearsay if the witness only relays the original testing scientist's conclusions, then testifies that he agrees with them. *Bullcoming*, 564 U.S. at 661; *Lewis*, 2019 IL App (1st) 160864, ¶¶ 37-38. Like the witness in *Lewis*, Rochowicz did not offer his own opinions on the samples collected in this matter, formed from actual testing or independent consideration; instead, he only testified about the testing Burke performed, and affirmed he agreed with Burke's conclusions. Thus, Rochowicz did not testify as to any independent expert opinions, which could potentially render the report admissible for the nonhearsay purpose of explaining the bases for those opinions (if the *Williams* plurality is to be followed on the point, which we need not decide). *Williams*, 567 U.S at 58, 84. Moreover, there is no issue as to the testimonial nature of Burke's statements, as the statements qualify under either conception in *Williams* —Burke's testing took place after Conway was identified as the suspect (satisfying the plurality's standard (*Williams*, 567 U.S. at 84)), and the testing was performed with the goal of generating evidence to use at trial against Conway (satisfying the dissent's (*Id.* at 138 (Kagan, dissenting))). See *Leach*, 2012 IL 111534, ¶ 120-121;

*Lewis*, 2019 IL App (1st) 160864, ¶¶ 43-44.[1] Thus, the statements in Burke's report are testimonial regardless of whether they are analyzed for the primary purpose of accusing a specific suspect or developing evidence to use at trial more generally.

¶ 19     The State argues that Burke's report is admissible for the nonhearsay use of explaining the bases for Rochowicz's independent expert opinions, citing *People v. Nelson*, 2013 IL App (1st) 102619. There, the court explained that the testifying witness, though he was not the only scientist involved in the DNA testing at issue, was sufficiently involved in the testing process such that he could offer his own expert opinions regarding the testing. See *Nelson*, 2013 IL App (1st) 102619, ¶ 68 (expert not a surrogate where he handled the materials at issue, analyzed the data, and authored the report at issue). Setting aside that the *Nelson* court did not even address whether a non-testifying expert's report can be admitted for the nonhearsay use for which the State advocates, this argument fails because it is belied by the record. Rochowicz specifically clarified that he was not involved in Burke's original testing, and did no re-testing or independent review of the actual evidence. The *Lewis* court addressed a nearly identical scenario, and held that when a witness repeats another's conclusions then testifies that they agree, this is *Bullcoming*-style surrogate testimony. *Lewis*, 2019 IL App (1st) 160864, ¶¶ 37-38. Because Rochowicz only reviewed Burke's notes then testified that he agreed with Burke's conclusions, he did not testify to his own expert opinions about the GSR evidence in Conway's case, defeating the State's argument.

---

[1] We acknowledge that in *People v. Barner*, 2015 IL 116949, the supreme court utilized the *Williams* plurality's conception, along with Justice Thomas's concurrence, in finding a report non-testimonial. *Barner*, 2015 IL 116949, ¶¶ 60-64. We do not believe, however, that *Barner* invalidates the *Lewis* court's conception that a report which would be testimonial under both the *Williams* plurality's and dissent's tests is properly found to be testimonial, as *Barner* did not set aside (or even criticize) *Leach*.

¶ 20    Having found that a clear or obvious error occurred, we must determine if it is plain error. We begin with the first prong, and must determine if the evidence is so closely balanced that the error threatened to tip the scales against Conway. *Sebby*, 2017 IL 119445, ¶ 48. To determine if evidence is closely balanced, the reviewing court, "must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case," which "involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Id.* ¶ 53.

¶ 21    The State argues the evidence was not closely balanced because the eyewitness testimony and reasonable inferences from other circumstantial evidence left no doubt of Conway's guilt, citing his possession of the vehicle's keys, proximity to the sweatshirt, and the fact the firearm was located in the residence in which Conway was arrested.

¶ 22    We disagree, perhaps predictably, as we have already expressed our view that the evidence in this case was "closely balanced." Specifically, in our prior opinion, we stated:

> "Conway emphasizes that Story saw the shooter for only a few seconds from 150 feet away and, at that distance, Story could not have seen the shooter's face clearly. Story saw several Black men in the house the shooter entered. Story did not explain what distinguished those men from the shooter. Because of the time it took for back up to arrive, the shooter could have hidden the gun in the purse, taken off the hoodie, and left by the back door without Story seeing him depart." *Conway*, 2021 IL App (1st) 172090, ¶ 19.

> "Based on a distant eyewitness identification, the State presented a weak case, and the corroborating evidence presents some problems. According to the State, the shooter thought clearly enough to take off the hoodie, wash the gunshot residue off his hands, and hide the gun between mattresses in the basement, but he sat right next to the hoodie and

failed to wash the gunshot residue off the hoodie. While we find the State's characterization of the shooter odd, we find that the discovery of the gun, Conway's proximity to the hoodie, and the testimony that the shooter reached into the car for which Conway held the keys suffices as corroboration of the eyewitness identification. We find the evidence closely balanced but sufficient to support the conviction." *Id.* ¶ 20.

¶ 23    We maintain this reasoning here. Because the evidence was closely balanced, the clear error of admitting Rochowicz's testimony in violation of Conway's Confontation Clause rights constituted first-prong plain error, and accordingly we vacate his conviction and remand for a new trial. We note that there are no double jeopardy issues on remand because, as explained in our previous opinion, the evidence was sufficient to sustain the conviction despite being closely balanced, a view the Illinois Supreme Court specifically affirmed. *Id.*; *Conway*, 2023 IL 127670, ¶¶ 20-21; *People v. Bass*, 2021 IL 125434, ¶ 27. We further note that because we remand based on Conway's Confrontation Clause claim, we do not address the substance of his *Krankel* claim.

¶ 24    As a final note, we acknowledge that the parties discussed the Confrontation Clause issue in the context of harmless error in the briefing. While it is clear that for this unpreserved error, plain error review is appropriate (as Conway argues in his reply brief), the parties' discussion of this issue gives us occasion to briefly acknowledge the potential for confusion on how first-prong plain error and harmless error analysis interact. Specifically, the supreme court's cases could be read to diverge on whether the proper analysis is (1) where a clear or obvious error occurred and the evidence was closely balanced, reversal is automatically appropriate, regardless of whether that clear or obvious error was of the type that could affect the outcome of the case (See *Sebby*, 2017 IL 119445, ¶¶ 68-77: "The only question in a first-prong case, once clear error has been established, is whether the evidence is closely balanced") or (2) for reversal, the evidence must

be closely balanced *and* the clear or obvious error was one that could have affected the outcome (See *People v. Jackson*, 2022 IL 127256, ¶ 23 ("errors reviewable under the first prong of the plain error rule are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error")). *Sebby* attempted to bridge this gap by citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005), but the court's language in *Jackson* suggests the gap remains. See *Sebby*, 2017 IL 119445, ¶¶ 68-69; *Jackson*, 2022 IL 127256, ¶ 23. While we need not resolve the issue now, we note that this apparent tension could cause divergent results moving forward.

¶ 25                                    III. CONCLUSION

¶ 26     The admission of Rochowicz's testimony constituted first-prong plain error, and as such, Conway's conviction is reversed, and we remand for a new trial.

¶ 27     Reversed and remanded.